UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

**TONY MANCUSO**                               **CASE NO. 2:21-CV-03947**

**VERSUS**                                     **JUDGE JAMES D. CAIN, JR.**

**STARR SURPLUS LINES INSURANCE CO   MAGISTRATE JUDGE LEBLANC**

<u>**MEMORANDUM RULING**</u>

Before the court is a Motion for Partial Summary Judgment [doc. 99] filed by defendant Starr Surplus Lines Insurance Company ("Starr"). Plaintiff Tony Mancuso, in his official capacity as Calcasieu Sheriff and Tax Collector ("CPSO") opposes the motion. Doc. 112.

## I.
### BACKGROUND

This suit arises from damage to property owned by CPSO, a political subdivision of the state of Louisiana, in Hurricanes Laura and Delta and Winter Storm Uri. At all relevant times the property was insured under a surplus lines policy issued by Starr. CPSO filed suit in this court on November 12, 2021, alleging that Starr had failed to timely or adequately compensate it for covered losses. Doc. 1. Accordingly, it raised claims of breach of insurance contract and bad faith under Louisiana law. The matter is set for jury trial before the undersigned on April 22, 2024. Doc. 58.

Starr now moves for summary judgment on various coverage issues, namely: (1) that the policy is a scheduled policy, not a blanket limit of liability policy; (2) that the

policy's two year limitation to recover replacement cost value is enforceable; (3) that any recovery based on Actual Cash Value must be based on values as of the time and place of loss; (4) that any recovery for the Men's Prison's roof (Location 004) is limited to Actual Cash Value; (5) that there is no coverage for code upgrades that were not completed within two years of the date of loss and that any covered code upgrades are subject to a $1 million sublimit across all locations; (6) that the policy's sublimits are part of, and not in addition to, the policy's limit of liability; and (7) that any costs associated with testing for or remediating for mold are subject to the policy's mold exclusion, regardless of the cause of the mold. CPSO opposes the motion. Doc. 112. In its opposition it also objects to the SOV used by Starr, with both parties disputing which SOV was in place at the time of loss. *Id.*

## II.
### SUMMARY JUDGMENT STANDARD

Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party is initially responsible for identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). He may meet his burden by pointing out "the absence of evidence supporting the nonmoving party's case." *Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003). The non-moving party is then required to go beyond the pleadings and show that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To this end he must submit "significant probative evidence" in support of his claim. *State Farm Life Ins. Co. v.*

*Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The court is also required to view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000). Under this standard, a genuine issue of material fact exists if a reasonable trier of fact could render a verdict for the nonmoving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

### III.
### LAW & APPLICATION

#### A. Governing Law

Starr moves for summary judgment on various issues relating to interpretation of its policy. Under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), a federal court sitting in diversity jurisdiction applies the substantive law of the forum state. *Cates v. Sears, Roebuck & Co.*, 928 F.2d 679, 687 (5th Cir. 1991). Louisiana law provides that an insurance policy is a contract and that its provisions are construed using the general rules of contract interpretation in the Louisiana Civil Code. *Hanover Ins. Co. v. Superior Labor Svcs., Inc.*, 179 F.Supp.3d 656, 675 (E.D. La. 2016). The words of the policy are given their generally prevailing meaning and "interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." *Coleman v. Sch. Bd. of Richland Par.*,

418 F.3d 511, 516–17 (5th Cir. 2005) (citing La. Civ. Code arts. 2047, 2050). Ambiguities in the policy must be construed against the insurer and in favor of coverage. *Id.* The court resolves an ambiguity by asking "how a reasonable insurance policy purchaser would construe the clause at the time the insurance contract was entered." *Id.*

### B. Application

#### 1. Scheduled policy vs. blanket policy

Starr first asks for a judgment to the effect that the policy is a scheduled, rather than blanket, policy and that CPSO's recovery for losses at any Location (for buildings, contents, and/or business interruption) is limited to the value declared for any specific coverage on the submitted statement of values. The policy's Occurrence Limit of Liability Endorsement provides:

> A. It is agreed that the following special terms and conditions apply to, and are made a part of, the POLICY to which this Endorsement is attached:
> 1. The Limit of Liability or Amount of Insurance shown in the Declarations of this POLICY, or endorsed onto this POLICY, is the total limit of the COMPANY's liability applicable to each OCCURRENCE as hereafter defined. Notwithstanding any other terms and conditions of this POLICY to the contrary, in no event shall the liability of the COMPANY exceed this limit or amount irrespective of the number of LOCATIONS involved.
> 2. The premium for this POLICY is based upon the Schedule of Values on file with the COMPANY, or attached to this POLICY. In the event of loss hereunder, liability of the COMPANY **shall be limited to the least of the following**:
>     a. The actual amount of loss, less applicable deductible(s);
>     b. The **total stated value for the property involved**, for Property Damage and TIME ELEMENT separately, **as specified in the latest Statement of Values on file with the COMPANY, or attached to this POLICY**, less applicable deductible(s);
>     c. The limit of liability or Amount of Insurance specified in the Declarations of this POLICY, or endorsed onto this POLICY.

Doc. 97, att. 2, p. 70 (emphasis added). CPSO argues that "total stated value" is ambiguous and should thus be read in favor of coverage to mean the entire limit of liability for the policy. The clause specifies that these stated values are found within the SOV, which provides values on a per building basis and then a total value ($56,700,621.00) for all properties, which corresponds to the limit of liability on the policy's declarations as set forth under 2(c). Doc. 111, att. 3; *see* doc. 97, att. 2, p. 3. CPSO's reading would render subsections (b) and (c) virtually identical, defeating the purpose of the different terms applied in each. Instead, "total" is more coherently read horizontally across the chart for each property to include the different kinds of coverage (Building Value, Content Value, and Business Interruption Value), especially as the SOV sums these into a column titled "Total Insured Value." Doc. 111, att. 3; *accord Berkshire Refrigerated Warehousing LLC v. Com. Underwriters Ins. Co.*, 2006 WL 862877 (N.D. Ill. Mar. 27, 2006). Accordingly, Starr's motion is granted to the extent that the "Total Insured Value" on the SOV provides its limit of liability for each property under subsection 2(c) of the Occurrence Limit of Liability Endorsement.

### 2. Enforceability of two-year limitation period

Starr next moves for summary judgment on the enforceability of the two-year limitation period for recovery of replacement cost under its policy. The policy's Replacement Cost Endorsement states, in relevant part:

> The COMPANY shall not be liable under this Endorsement for any loss:
> a. occasioned directly or indirectly by enforcement of any ordinance or law regulating the use, construction, repair or demolition of any structure(s) unless such liability has been specifically assumed under this POLICY;

    b. unless and until the damaged or destroyed property is actually repaired or replaced by the Insured with due diligence and dispatch, and in no event, unless repair or replacement is completed within two (2) years after the destruction or damage, or within such further time as the Company may during the two (2) years, in writing, allow.

Doc. 99, att. 7, p. 75. This court has previously held that the "prevention of performance" may void this limitation, however, if the insured can show that it was unable to complete repairs within the two-year period because of underpayment by the insurer. *E.g.*, *TGS Properties LLC v. Covington Spec. Ins. Co.*, 2023 WL 6430676, at *2 (W.D. La. Sep. 28, 2023). Starr points to *Orleans Parish School Board v. Lexington Insurance Company*, 118 So.3d 1203 (La. Ct. App. 4th Cir. 2013), in which a Louisiana appellate court held that the doctrine did not apply. It also argues that CPSO cannot show an inability to make repairs, because the payments issued by Starr were sufficient to cover the actual incurred costs identified by CPSO. In opposition CPSO points to this court's prior decisions and further notes that the Louisiana Third Circuit Court of Appeal has rejected the Fourth Circuit's position. *Mason v. Shelter Mut. Ins. Co.*, 209 So.3d 860 (La. Ct. App. 3d Cir. 2016). This court has repeatedly made its position clear, a position which is the subject of a circuit split among the Louisiana appellate courts, and will not change course until presented with binding authority to the contrary.

### 3. Actual Cash Value recovery

Next, Starr asserts that any recovery based on Actual Cash Value must be calculated from the time and place of the loss. The policy's Valuation Clause states:

> In case of loss, the basis of adjustment, unless otherwise endorsed hereon, shall be as follows at the time and place of loss:
> . . . .

      c.  Buildings and other structures, at ACTUAL CASH VALUE unless otherwise endorsed hereon[.]

Doc. 99, att. 7, pp. 24–25. CPSO maintains that Starr has waived its right to limit recovery based on this clause because its prior payments, tendered up to two years after loss, were based on more recent pricing data.

Under Louisiana law, waiver requires "an existing right, a knowledge of its existence and an actual intention to relinquish it or conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished." *Moreno v. Entergy Corp.*, 233 So.3d 176, 184 (La. Ct. App. 5th Cir. 2017) (citing *Arceneaux v. Amstar Corp.*, 66 So.3d 438, 451 (La. 2011)). Waiver may apply to any provision of an insurance contract, even if it has the effect of extending coverage. *Steptore v. Masco Const. Co.*, 643 So.2d 1213, 1216 (La. 1994); Additionally, an insurer is charged with knowledge of the contents of its own policy. *Koehl v. RLI Ins. Co.*, 367 So.3d 122, 129 (La. Ct. App. 5th Cir. 2023) (citing *Steptore*, 643 So.2d at 1216)).

CPSO contends that none of the ten payments issued by Starr were based on August 2020 pricing. To this end it cites an estimate prepared by Leverenz in April 2022, which appears to be based on April 2021 pricing. *See* doc. 112, att. 5, p. 3. It also notes Leverenz's statement that "additional information and further actual cash values developed during the ongoing adjustment process" as he made recommendations to Starr for further payments. Doc. 99, att. 9, ¶ 6. Accordingly, CPSO maintains that its experts, consultants, contractors, and adjusters have also used updated prices, in reasonable reliance on Starr's practices.

CPSO's evidence shows that Starr used updated pricing on at least one adjustment. It maintains, without proof, that this was its practice across all of the payments it issued. The court does not have sufficient evidence as to Starr's conduct or that of CPSO's consultants to enter judgment in CPSO's favor on the issue. But CPSO has succeeded in creating an issue of material fact, and so the jury will decide whether Starr has waived this term of its policy by its inconsistent conduct.

### 4. Limitation of Men's Prison Roof

Starr also moves for summary judgment limiting recovery for the men's prison roof to actual cash value. The men's prison is Location 004 under the policy and the Schedule of Values reflects that it was built in 1998. Doc. 99, att. 8, p. 2. The policy's Roof Limitation Endorsement states, in relevant part:

> The coverage provided by this POLICY . . . is limited as respects direct physical loss or damage to ROOF SURFACING caused by WIND or NAMED WINDSTORM as defined in the policy.
> A. In case of loss, the basis of adjustment for damage to ROOF SURFACING that has been in place on an insured building or structure for fifteen (15) years or more will be ACTUAL CASH VALUE, at time and place of loss.
> B. The term "ROOF SURFACING" means: 1. the roofing material exposed to the weather; 2. the underlayment applied for moisture protection; 3. all materials used in securing the roof surfacing all flashings required in the replacement of the roof surfacing.

Doc. 99, att. 7, p. 77. CPSO does not dispute that this endorsement applies but maintains that there is a genuine issue of material fact as to (1) which layers of the multi-layered prison roof system the endorsement applies to and (2) the valuation of the ACV, through the waiver issue described above. Doc. 112, p. 22.

On the first issue, CPSO maintains that the jury must decide which portions of the men's prison roof meet the policy's definition, noting that the men's prison roofs were originally "built-up gravel ballasted roof systems with multilayers that sit on top of a metal decking." Doc. 112, p. 22. While Starr maintains that the policy language is broad enough to cover the entire roof, it produces no testimony, diagrams, or other evidence in support of its case. Furthermore, the definition appears to exclude at least some roof-related materials such as decking. The court lacks sufficient evidence to make that determination and thus only grants the motion as far as the limitation's general applicability, leaving it to the jury to determine its extent. As for waiver, CPSO may present at trial its argument as to whether ACV is based on time of loss or adjustment based on Starr's inconsistent conduct.

**5. Code upgrades**

The policy's Increased Cost of Construction & Demolition Endorsement provides an extension of coverage for:

1. The increased cost of repair, rebuilding or construction of the building(s) or structure(s) covered under this POLICY, on the same premises, of like size and occupancy, caused by loss from any peril insured against under this POLICY and resulting from the enforcement of, and limited to the minimum requirements of, any law or ordinance regulating the construction or repair of damaged building(s) or structure(s); and
2. The insured value of the undamaged portion, and the cost of demolishing any such undamaged portion of the building(s) or structure(s) covered under this POLICY, including the cost of clearing the site thereof, caused by loss from any peril insured against under this POLICY and resulting from enforcement of any law or ordinance regulating the construction or repair of building(s) or structure(s) and in force at the time of loss which necessitate such demolition[.]

Doc. 99, att. 7, p. 61. A $1,000,000.00 sublimit applies to this coverage. *Id.* at 15. As with the Replacement Cost Endorsement, this extension of coverage is limited to repair or replacement "completed within Two (2) years after the destruction or damage, or within such further time as the COMPANY may allow, in writing, during the Two (2) years." *Id.* For the same reason set forth above, summary judgment is denied on this issue and CPSO may present at trial evidence that the condition is excused by Starr's failure to provide it with sufficient funds to make repairs within the two-year period.[1]

### 6. Policy sublimits

Starr also moves for a ruling that the policy's sublimits are part of, and not additional to, the policy's limits of liability and that certain of these sublimits have been satisfied. It points to the policy's Application of Sublimits Endorsement, which states in relevant part:

> **Application To Insured Interests.** Each sublimit stated in this POLICY applies as part of, and not in addition to, the overall POLICY Limit of Liability for an OCCURRENCE insured hereunder. Each sublimit is the maximum amount potentially recoverable from all insurance layers combined for all insured loss, damage, expense, TIME ELEMENT or other insured interest arising from or relating to that aspect of the OCCURRENCE, including but not limited to type of property, construction, geographic area, zone, location, or peril.

Doc. 99, att. 7, p. 94. Starr further asserts that the Extra Expense sublimit ($50,000) and Trees and Shrubs sublimit ($100,000) have both been paid. Doc. 99, att. 1, p. 25.

In response CPSO does not dispute that "there are specific sublimits in the Policy, as a part of the overall limit of liability." Doc. 112, p. 25. It maintains, however, that a

---

[1] CPSO argues that this "Endorsement and limit of $1,000,000.00 for code upgrades is inapplicable" because its code upgrade repair costs were only required to repair its hurricane damages. To the extent it is not seeking the extension of coverage provided under this section, the issue is moot.

Page 10 of 15

genuine issue of material fact exists as to whether Starr has satisfied the $100,000.00 sublimit for trees and shrubs. To this end it points to Leverenz's Master Loss Schedule from December 2023, which notes a tree sublimit of $100,000 in the adjustment comments for the row assigned to Location 004, Building 001 – Calcasieu Sheriff's Prison Main Building & Generators. Doc. 112, att. 5, p. 1. The same row assigns an RCV of $5,481,304 to the building, based on J.S. Held's estimate showing an RCV of $4,866,784 for repair costs[2], plus allocated engineering and architect fees of $425,970 and a management fee of $188,550. CPSO maintains that tree replacement is not covered under the J.S. Held estimate for that location and that the costs were therefore not allocated under payments for Location 004. Starr has not yet met its burden of showing that this sublimit was met. Starr has also produced no evidence of its satisfaction of the extra expense sublimit. Accordingly, summary judgment is granted to the extent that sublimits are contained within, and not additional to, the policy's overall limit of liability but denied as to Starr's satisfaction of any individual sublimit.

### 7. Mold exclusion

Finally, Starr moves for summary judgment on the applicability of the policy's mold exclusion. The policy provides:

> 6. PERILS EXCLUDED
>
> This POLICY does not insure against loss or damage caused by or resulting from any of the following regardless of any cause or event contributing concurrently or in any other sequence to the loss:
> . . . .

---

[2] The J.S. Held estimate is attached to the spreadsheet. *See* doc. 112, att. 5, pp. 3–112.

> q. Mold, moss, mildew, fungi, spores, bacterial infestation or any similar organism, wet or dry rot and extremes of temperature or humidity, whether directly or indirectly the result of a covered peril. This exclusion applies, and is not limited to, the cost for investigation, testing, remediation services, Such loss, damage, costs, or expenses are excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss, or whether such loss is directly or indirectly, proximately or remotely, or in whole or in part caused by, the result of, contributed to or aggravated by any other peril.

Doc. 99, att. 7, p. 22.

Starr broadly seeks a ruling "on any aspect of Mancuso's claim related to investigating, testing, and remediating mold or damage caused, in part or in whole, by mold." Doc. 99, att. 1, p. 27. CPSO does not dispute the clause's meaning but responds that no part of its claimed damages includes mold testing or damages caused by mold. Specifically, it maintains that it is not seeking reimbursement for the mold testing that was performed in December 2020 and that its "incurred hurricane and freezer repair costs, including mitigation, were not caused by or resulted from mold." Doc. 112, p. 26. In the absence of anything more specific, the court will grant the motion on this issue to the extent that the plain language of the exclusion applies but defer to trial any dispute over whether mold played a role in a specific claim.

### 8. Applicable SOV

Finally, the parties have disputed here and elsewhere which SOV applies in this matter. Starr has introduced a declaration from assistant vice president Timothy Drag, who was the lead underwriter for the policy issued to CPSO in effect from May 1, 2020, to May 1, 2021. Doc. 111, att. 1. Drag states:

> [CPSO] submitted to Starr a revised and final Statement of Values ("SOV") that Starr relied on in the underwriting of the Policy. The SOV accepted by Starr at the inception and time of the losses was bound with the Policy. Starr accepted the information included in the final SOV from Mancuso and on file with Starr as true and correct. . . . The bound SOV in place at the time of loss for Hurricanes Laura and Delta and Winter Storm Uri, is attached to this declaration as Exhibit 2.

*Id.* at ¶ 6.

Attached as Exhibit 2 to Drag's declaration is an SOV [doc. 111, att. 3] relied on by Starr in this and other motions. CPSO maintains that Starr's SOV differs because it "does not include the Forensic Lab on Line 82." In CPSO's SOV, the Forensic Lab is only referenced in a note at the bottom of the sheet:

| | | | | | |
|---|---|---|---|---|---|
| 01 | OFFICES 1st, 2nd, 3rd and 6th floors | 1011 LAKESHORE DR | LAKE CHARLES | LA | 70601 |
| 01 | OFFICE | 1000 RYAN ST SUITE 1 | LAKE CHARLES | LA | 70601 |
| | TRAINING DRIVING SIMULATOR | 3001 INDUSTRIAL BLVD | LAKE CHARLES | LA | 70605 |
| | AUTO CAT COVERAGE | .35 rate | | | |
| 01 | SEIZED VEHICLES | 5716 BROAD ST. | LAKE CHARLES | LA | 70601 |
| 01 | UNSCHEDULED FARM EQUIPMENT MISC. | 5400 E. BROAD ST. | LAKE CHARLES | LA | 70601 |
| | BLANKET COMPUTERS | VARIOUS LOCATIONS | | | |
| | TOWERS EQUIPMENT | 706 ENTERPRISE BLVD | LAKE CHARLES | LA | |
| | BLANKET EARNINGS AND EXTRA EXPENSE | | | | |

| | | |
|---|---|---|
| | NOTES FROM JEFF COLE 3/22/18 | |
| | Calcasieu Law Enforcement Centers : | |
| OP | North Lake Charles owned | |
| /ind/Hail | South Lake Charles owned/leased property from Airport Dist #1 | |
| amed | Sulphur Owned | 721 B. East Prien Lk Rd., Forensic Lab on Pollution, not sure if owned yet? |
| | Carlyss Owned leased property from Jeff Davis bank | |
| | Vinton Owned | |
| | Dequincy Leased from Calcsieu Parish Health Unit | |
| | Starks Leased from Willard White | MISSING |
| | Moss Bluff Owned | |

Doc. 103, p. 1. Meanwhile, it also appears at the bottom of the SOV attached by Drag but as a line item with no stated value:

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 5 | 001 | BELL CITY SUBSTATION SHERIFF'S OFFICE BUILDING | 7085 HIGHWAY 14 | BELL CITY | LA | 70630 | N 30-07-10.6 | W 092-57-44.6 | 111,000 | 20,000 |
| 6 | 001 | STARKS SUBSTATION | 4352 HIGHWAY 12 | STARKS | LA | | | | 168,000 | 8,000 |
| 7 | 001 | OFFICES 1st, 2nd, 3rd and 6th floors | 1011 LAKESHORE DR | LAKE CHARLES | LA | 70601 | | | | 125,000 |
| 8 | 001 | OFFICE | 1000 RYAN ST SUITE 1 | LAKE CHARLES | LA | 70601 | | | | 52,000 |
| 9 | 001 | TRAINING DRIVING SIMULATOR | 3001 INDUSTRIAL BLVD | LAKE CHARLES | LA | 70605 | | | | 125,000 |
| | | AUTO CAT COVERAGE | .35 rate | | | | | | | 2,000,000 |
| 10 | 001 | SEIZED VEHICLES | 5716 BROAD ST. | LAKE CHARLES | LA | 70601 | | | | 250,000 |
| 11 | 001 | UNSCHEDULED FARM EQUIPMENT MISC. | 5400 E. BROAD ST. | LAKE CHARLES | LA | 70601 | | | | 200,000 |
| | | BLANKET COMPUTERS | VARIOUS LOCATIONS | | | | | | | 670,000 |
| 10 | | TOWERS EQUIPMENT | 706 ENTERPRISE BLVD | LAKE CHARLES | LA | | | | | 540,800 |
| | | BLANKET EARNINGS AND EXTRA EXPENSE | | | | | | | | |
| | | FORENSIC LAB | 721 B EAST PRIEN LAKE RD. | LAKE CHARLES | LA | 70601 | | TOTAL | 42,645,821 | 13,954,800 |

NOTES FROM JEFF COLE 3/22/18
Calcasieu Law Enforcement Centers :
ILES:    North Lake Charles owned                                                        56,700,621
,000  AOP
0,000 Wind/Hail   South Lake Charles owned/leased property from Airport Dist #1
‚    Named  Sulphur Owned
rricane    Carlyss Owned leased property from Jeff Davis bank
Vinton Owned
Dequincy Leased from Calcasieu Parish Health Unit
Starks Leased from Willard White          MISSING
Moss Bluff Owned
Iowa Owned
Bell City Leased from CPPJ     Keep Insurance on all leased substations

Doc. 111, att. 3.

As CPSO notes, Starr previously introduced the SOV on which CPSO now relies with a declaration from Drag stating that it was part of the bound policy "provided to and accepted by CPSO." Doc. 67, att. 2, ¶¶ 6–7; *see* doc. 67, att. 6. Furthermore, CPSO has used that SOV as an exhibit to its 30(b)(6) deposition of a Starr witness without objection. Doc. 112, att. 3. Accordingly, CPSO seeks to have Starr's reliance converted to a judicial confession. It argues that, under CPSO's SOV, the limited reference to the Forensic Lab creates an opportunity for coverage under the policy's "Unnamed Location Coverage Endorsement." That provision states:

> Subject to all terms, conditions, exclusions, limitations and stipulations of the POLICY to which this Endorsement is attached, not in conflict herewith, this POLICY is extended to cover Real and Personal Property at Unnamed Locations owned, leased or rented by the Insured but not specified in the Schedule of Locations.

Doc. 99, att. 7, p. 88. Coverage under this section is subject to a sublimit of $250,000.00. *Id.* at 15.

Under Louisiana Civil Code article 1853, a judicial confession "constitutes full proof against the party who made it." "To constitute a judicial confession, a statement must be an express acknowledgment of an adverse fact." *Perry v. Phelps Dunbar LP*, 2007 WL 9700865, at *4 (M.D. La. 2007) (citing *Ramelow v. Bd. of Trustees, Univ. of La. Sys.*, 870 So.2d 415, 418 (La. Ct. App. 3d Cir. 2004)). A judicial confession may only be revoked because of an error of fact and has the effect of waiving evidence as to the subject of admission. La. Civ. Code art. 1853; *Crawford v. Deshotels*, 359 So.2d 118 (La. 1978).

Starr contends that, to the extent a judicial confession was made, it was a mere factual error and should be withdrawn. It notes that the deposition of CPSO's broker, Nancy Sylvester, was taken last week and indicates that Ms. Sylvester confirmed that the SOV attached to Drag's later declaration is the correct one.[3] Accordingly, the court will defer its ruling on the correct SOV and coverage for the Forensic Building.

### IV.
#### CONCLUSION

For the reasons stated above, the Motion for Partial Summary Judgment [doc. 99] will be **GRANTED IN PART**, **DENIED IN PART**, and **DEFERRED IN PART**.

**THUS DONE AND SIGNED** in Chambers on the 3rd day of April, 2024.

JAMES D. CAIN, JR.
**UNITED STATES DISTRICT JUDGE**

---

[3] Starr states that the transcript of this deposition is not yet available but that it will supplement its reply upon receipt.